**BANKAMERICA CORPORATION,
Plaintiff-Appellee,**

v.

**BOARD OF GOVERNORS OF the
FEDERAL RESERVE
SYSTEM, Defendant,**

**National Computer Analysts, Inc.,
Defendant-Intervenor-Appellant.**

**BANKAMERICA CORPORATION,
Plaintiff-Appellee,**

v.

**BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
Defendant-Appellant,**

**National Computer Analysts, Inc.,
Defendant-Intervenor.**

**BANKAMERICA CORPORATION,
Petitioner,**

v.

**BOARD OF GOVERNORS OF the
FEDERAL RESERVE SYSTEM,
Respondent,**

**National Computer Analysts,
Inc., Intervenor.**

Nos. 77-3485, 77-3629 and 77-2173.

United States Court of Appeals,
Ninth Circuit.

May 14, 1979.

Rehearing Denied in Nos. 77-3485 and
77-3629 June 8, 1979.

James V. Mattingly, Jr., San Francisco, Cal., for defendant-appellant. ,

H. Helmut Loring, San Francisco, Cal., Christopher S. Rooney, New York City, for plaintiff-appellee.

Before DUNIWAY, CHOY and SNEED, Circuit Judges.

DUNIWAY, Circuit Judge:

Under the Bank Holding Company Act, 12 U.S.C. § 1841 *et seq.* ("the Act"), a bank holding company such as BankAmerica may not engage in or expand its nonbanking activities without the approval of the Board of Governors of the Federal Reserve System ("the Board"). In 1976 BankAmerica asked the Board to approve an expansion of the nonbanking activities carried on by its data-processing subsidiary, Decimus Corporation. Before any Board decision on its application, BankAmerica filed an action in the District Court for the Northern District of California for a declaration that its application had been granted by operation of law under Section 4(c) of the Act, 12 U.S.C. § 1843(c). Meanwhile, the Board ordered a hearing on the application. Later, the district court granted BankAmerica's motion for summary judgment.

In No. 77–3629, the Board appeals from the district court judgment, arguing that the district court did not have jurisdiction, and that in any event it was error for the district court to hold that BankAmerica's application had been granted by operation of law. In No. 77–3485, one of Decimus' competitors, National Computer Analysts, Inc. ("National"), appeals from the district court's denial of its motion to intervene in the declaratory judgment action. In No. 77–2173, BankAmerica petitions for review of the Board's order for a hearing on the application.

We hold that the district court had jurisdiction, but reverse its decision that the application had been granted by operation of law. We dismiss the petition to review the Board's order for a hearing because it is interlocutory. Because we reverse the district court's judgment on the merits, we need not reach National's appeal, and we dismiss it.

### I. *Background.*

Under 12 U.S.C. § 1843(c),

In the event of the failure of the Board to act on any application . . . within the ninety-one day period which begins on the date of submission to the Board of the complete record on that application, the application shall be deemed to have been granted.

The parties agree that this ninety-one day rule applies to BankAmerica's application. If the ninety-one days had run, the district court would have been correct in holding the application granted by operation of law. It is the "submission to the Board of the complete record on [an] application" that triggers the running of the ninety-one days. Thus the validity of the district court's judgment depends upon when, if ever, "the complete record" was submitted to the Board. For this reason, we present the factual chronology in some detail.

In 1974 BankAmerica applied to the Board for permission for Decimus to open a data processing center in Piscataway, New Jersey. The Act permits bank holding companies and their subsidiaries to engage in activities other than owning and controlling banks if the Board determines that such nonbanking activities are "closely related to banking" and that such activities "can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices." 12 U.S.C. § 1843(c)(8). The Board has de-

termined by regulation that certain types of activities such as providing financial data processing are closely related to banking. See 12 C.F.R. 225.4(a)(8). When a holding company proposes to engage in such activities or expand the scope of its involvement in such activities, the Board weighs the expected public benefits against the possible adverse effects on a case by case basis.

By regulation, the Board has delegated the power to approve such nonbanking activities to individual Federal Reserve Banks. 12 C.F.R. §§ 225.41(b)(1) and 265.-2(f)(20)(i). BankAmerica is headquartered in San Francisco; so the Federal Reserve Bank of San Francisco passed upon and approved the application to open the Decimus data processing center in Piscataway in late 1974.

National is a data processing concern based in Philadelphia. The opening of the Piscataway operation made National a competitor of Decimus. Under 12 U.S.C. § 1850, National had "the right as an aggrieved party to obtain judicial review" of the Federal Reserve Bank's original approval of Decimus' Piscataway operation. National could have obtained such review by filing a petition for review within thirty days in the Court of Appeals for the Third Circuit, within which it had its principal place of business, or in the Court of Appeals for the District of Columbia. 12 U.S.C. § 1848. Instead, National tried to attack the approval collaterally by bringing an action against the Board in the District Court for New Jersey. National added its allegations against the Board to an earlier action filed by it against BankAmerica, Decimus, and Bank of America, N.T. & S.A. which alleged violations of the Sherman Act, violations on the anti-tying provisions of the Bank Holding Company Act (12 U.S.C. § 1971 et seq.), violations of the New Jersey antitrust laws, and acts of unfair competition. On April 30, 1976, the District Court for New Jersey dismissed the claims in that action directed against the Board, holding that National should have utilized the direct review procedure in a court of appeals to challenge the Board's approval of the Piscataway office. National appealed to the Third Circuit.

While that appeal was pending, National complained to the Board that Decimus had begun soliciting business in Philadelphia. BankAmerica admitted the solicitations, but claimed that the 1974 approval had meant to authorize activities throughout Decimus' "natural market area" which it interpreted to include most of the east coast.

The Board disagreed, instructing BankAmerica that the 1974 approval did not authorize activities in Pennsylvania. To enable Decimus to solicit business throughout the northeastern and middle Atlantic states, BankAmerica then applied for the Board's approval to expand Decimus' activities, the matter which is at issue here.

In order to comply with Board regulations requiring notice to potential competitors, BankAmerica advertised its intended expansion by publishing two and one-half inch legal notices in the Wall Street Journal and eight other eastern newspapers between September 8 and 10, 1977.

On September 28, 1976, BankAmerica notified the Federal Reserve Bank of San Francisco of its intention to expand the operations of Decimus. On October 7, 1976, National protested the Decimus expansion, and it submitted further objections and requested a hearing in additional communications dated October 14 and 25, November 19 and 23, and December 1, 2, 3 and 8, 1976. On November 9, 1976, the Federal Reserve Bank of San Francisco notified BankAmerica that the Reserve Bank would not approve BankAmerica's application, but rather would refer it to the Board. The Reserve Bank directed BankAmerica not to consummate the expansion until specifically authorized by the Board. See 12 C.F.R. § 265.2(f)(20)(ii).

As news of the Decimus application spread, other competitors protested the proposed expansion of its activities into their areas, either directly or through various Congressmen and Senators. National Association of Bank Servicers of Columbus, Ohio, protested on November 21, 1976. On November 29, 1976, On-Line Service Corp. of Philadelphia protested and requested a hearing. The Board received additional

protests, comments, inquiries, and requests that it hold a hearing as follows: Congresswoman Fenwick of Philadelphia (December 13, 1976); Virginia Data Center of Norfolk, Virginia (January 4, 1977); Bankputer of West Haven, Connecticut (January 6, 1977); Datatel, Inc., of Alexandria, Virginia (January 12, 1977); System Development Corp. of Santa Monica, California (January 18, 1977); Senator Case of New Jersey (January 21, 1977); Delmarva Bank Data Processing Center, Inc. ("Delmarva") of Denton, Maryland (March 2, 1977); Senator Sarbanes of Maryland (April 13, 1977). Delmarva elaborated on its protest and submitted additional information on April 18, May 13, and May 17, 1977. On May 20, 1977, the Board responded to the protests and comments by ordering a hearing on the proposed geographic expansion of Decimus.

BankAmerica concedes that the testimony and evidence presented at such a hearing would form a part of "the complete record on that application" within the meaning of the ninety-one day rule, and thus that the ninety-one days would not usually begin to run until the conclusion of such a hearing. It nevertheless contends that in this case the complete record was actually submitted to the Board on December 27, 1976, that the ninety-one days therefore ran on March 28, 1977, and thus that the application had been approved by operation of law before the Board had ordered the hearing. The following additional facts bear upon these contentions.

The two and one-half inch legal notice BankAmerica inserted in the nine newspapers between September 8 and 10 followed the format set forth in Board form F.R.Y.–4A. That format includes the statement "Persons wishing to comment on this proposal should submit their views in writing within 30 days of the date of publication of this notice. . . ." BankAmerica interprets this as requiring the Board to refuse to make part of "the complete record on [an] application" any comments received after thirty days. The Board, however, interprets its form as simply giving it the discretion to reject comments not submitted within thirty days.

National initially protested the Decimus application on October 7, 1976. Because all of the other protests, comments, inquiries, and requests for hearing were received more than thirty days after September 10, 1976, BankAmerica submits that none of them could become part of the "complete" record, and thus restart the running of the ninety-one days as of the date of their inclusion. BankAmerica continually urged the Board to reject the comments as untimely, but the Board exercised its claimed discretion to make the comments part of the record on the ground that it felt the comments would prove helpful in deciding whether the Decimus expansion was in the public interest.

On November 23, 1976, the Board asked National to provide it with specific information concerning its protest. On November 26, 1976, the Board forwarded a copy of National's protests to BankAmerica and asked for a response. BankAmerica responded on December 6, 1976. National supplied the information on December 10, 1976, and replied to BankAmerica's arguments on December 20, 1976. The Board received BankAmerica's rebuttal on December 27, 1976. BankAmerica concedes that the Board acted correctly in making these communications part of the record. Asserting that its December 27, 1976 rebuttal was the latest submission that the Board had a right to consider part of the record, BankAmerica contends that the ninety-one days began to run on that date. It thus concludes that its application was approved by operation of law on March 28, 1977.

On May 5, 1977, the Third Circuit rejected National's attempted collateral attack on the Board's 1974 approval of the Piscataway office. On the same day, BankAmerica sent a letter to the Board claiming that the ninety-one days had run. The Board's General Counsel telephoned BankAmerica on May 10, 1977, to insist that the ninety-one days had not run and confirmed this oral advice in a May 13, 1977 letter. On that day, BankAmerica filed its declaratory judgment action in the United States District Court for the Northern District of California. The Board ordered a hearing on

the merits of Decimus' application on May 20, 1977.

On May 26, 1977, BankAmerica petitioned this court for review of the Board's hearing order. (No. 77–2173.) On July 6, 1977, the parties agreed to stay the hearing by the Board on the merits pending a judicial determination of BankAmerica's ninety-one day claim. On August 2, 1977, the district court granted BankAmerica summary judgment on that claim and denied National's petition to intervene. The Board appeals from that judgment in No. 77–3629. National appeals from the denial of intervention in No. 77–3485. On July 22, 1977, this court granted National's motion to intervene in No. 77–2173, BankAmerica's petition for review of the hearing order.

## II. *Jurisdiction.*

### A. *The Board's Appeal from the District Court Judgment in No. 77–3629.*

■ Section 9 of the Bank Holding Company Act, 12 U.S.C. § 1848, provides that:

Any party aggrieved by an order of the Board under this chapter may obtain a review of such order in the United States Court of Appeals within any circuit wherein such party has its principal place of business or in the Court of Appeals in the District of Columbia, by filing in the court, within thirty days after the entry of the Board's order, a petition praying that the order of the Board be set aside.

The Board argues that this provision vests exclusive jurisdiction to review Board action or inaction on applications in the courts of appeals, and that the district court should have dismissed BankAmerica's action for want of subject matter jurisdiction.

As a general proposition, the Board's argument is correct. In *Whitney National Bank v. Bank of New Orleans & Trust Co.,* 1965, 379 U.S. 411, 421–22, 85 S.Ct. 551, 558, 13 L.Ed.2d 386, the Supreme Court rejected "the notion that the Board's determination may be collaterally attacked in the District Court . . ." holding that "the statutory steps provided in the Act are exclusive." *Accord, Investment Co. Institute v. Board of Governors,* 1977, 179 U.S.App.D.C. 311, 551 F.2d 1270, 1278–1279; *National Com-*

*puter Analysts v. Decimus Corp.,* 3 Cir., 1977, 556 F.2d 568, *aff'g without opinion,* D.N.J., 1976, No. 74–1684.

■ This general rule applies even where the ninety-one day period has run before a Board order purporting to deny an application, if the Board's order is entered before the commencement of district court proceedings. In such a case, the aggrieved party's sole remedy is to present its ninety-one day rule contention to a court of appeals in a § 1848 petition. *Memphis Trust Co. v. Board of Governors of the Federal Reserve System,* 6 Cir., 1978, 584 F.2d 921.

■ The case at bar does not, however, come within the rationale of the general rule as applied in *Memphis Trust.* 12 U.S.C. § 1848 requires "an order of the Board" and grants standing to "any party aggrieved" by such an order to "obtain a review of such order." In *Whitney, supra, Investment Co. Institute, supra,* and *Memphis Trust, supra,* the Board had unquestionably entered orders which had the potential to adversely affect the parties. The Board had entered those orders *before* the parties had sought district court review. Here, the Board had entered no order of any kind before the filing of BankAmerica's district court action. In the absence of an order, § 1848 did not entitle BankAmerica to petition this court directly.

We recognize that in a particular case a protracted delay can become the functional equivalent of a formal order of denial and can thus be reviewed as such. *See, e. g., Environmental Defense Fund, Incorporated v. Hardin,* 1970, 138 U.S.App.D.C. 391, 428 F.2d 1093, 1098, 1099, and *Deering Milliken, Inc. v. Johnston,* 4 Cir., 1961, 295 F.2d 856, 865–66. Nevertheless, that principle does not apply here. A Board delay beyond ninety-one days could not be viewed as tantamount to a denial, because such a delay would result in the granting of the application, not its denial. Similarly, viewing Board delay as tantamount to an order of approval would not enable BankAmerica to petition this court under § 1848, because BankAmerica would not be "aggrieved by [such] an order."

No Board order which could support a § 1848 review by this court had issued before May 13, 1977. We therefore hold that on that date the district court had federal question jurisdiction under 28 U.S.C. § 1331 to hear BankAmerica's action for a declaratory judgment under 28 U.S.C. § 2201.

The question then arises whether, by ordering a hearing on May 20, 1977, the Board deprived the district court of jurisdiction to proceed further. In our view, the answer depends upon whether that order for a hearing is directly reviewable under 12 U.S.C. § 1848. Because we hold that it is not,[1] we also hold that the district court both had jurisdiction when the action was filed, and retained it thereafter.

B. *The Petition to Review the Board's Order, No. 77–2173.*

█ Following judicial constructions of § 10 of the Administrative Procedure Act, 5 U.S.C. § 704, such as *Abbott Laboratories v. Gardner,* 1967, 387 U.S. 136, 149–56, 87 S.Ct. 1507, 18 L.Ed.2d 681, we interpret 12 U.S.C. § 1848 as authorizing the review of final orders only. Interlocutory Board rulings and orders may be reviewed as part of the review of the final orders that they precede, but are not independently reviewable.

To be sure, the Board's May 20, 1977 order for a hearing is premised on the Board's assumption that the ninety-one days had not run. Nevertheless, the order is a classic example of an interlocutory order. The strictures against undue judicial interference with ongoing agency proceedings apply with full force when, as here, we are asked to call a halt to the Board's decision making process. The doctrine of

the exhaustion of administrative remedies also inclines us against recognizing jurisdiction to cut off such a hearing. Had the hearing not been stayed by stipulation, it might well have enabled BankAmerica to convince the Board to approve its application either on its merits or on the strength of its ninety-one day rule contentions.

█ Our holding that we do not have jurisdiction under 12 U.S.C. § 1848 to review the interlocutory order for a hearing does not undercut the Congressional requirement that applications on which the ninety-one days have run be deemed granted; rather, it assures that the hearing order did not deprive the district court of its jurisdiction to decide the ninety-one day rule claim before the actual convening of the ordered hearing. The Board's petition for review must be dismissed.

III. *The Merits.*

BankAmerica argues that "the complete record on [its] application was submitted to the Board on December 27, 1976, the date when the Board received BankAmerica's second response to National's protest. Because the Board did not disapprove its application within the next ninety-one days, BankAmerica argues that its application must "be deemed to have been granted" by operation of 12 U.S.C. § 1843(c). The Board and intervenor National concede the applicability of the ninety-one day rule. The Board, however, argues that the record did not become complete on December 27, 1976, and that the ninety-one day period did not elapse before its order for a hearing was made on May 20, 1977.

1. If the order were reviewable under § 1848, we might hold that it would abate the jurisdiction of the district court. This would avoid duplication of judicial effort and afford prompt review, at the appellate level, of the Board's proceeding, in a case where the court would have before it a record of the Board's proceedings and the benefit of the Board's findings. *See Memphis Trust, supra,* 584 F.2d at 926. The district court in this case did not make any findings of fact or conclusions of law in granting the motion for summary judgment. The law does not require that it do so. In *Memphis Trust, supra,* the Sixth Circuit stated, in the context of a district court action filed *after* a final Board order that "the Board should be afforded an initial opportunity to rule upon the challenge to its jurisdiction to issue and enforce a denial order entered over 91 days after the complete record . . . had been received." 584 F.2d at 924, n.8. The Congressional interest in the prompt processing of applications persuades us not to apply that language to preclude a district court from exercising jurisdiction *before* a final Board order. *Memphis Trust* itself would allow a district court action for a declaratory judgment in a case like the one before us here. *See* 584 F.2d at 926.

In the Bank Holding Company Act Amendments of 1970, Congress reaffirmed its "longstanding policy of separating banking from commerce." S.Rep.No.91–1084, 91st Cong., 2d Sess. p. 3 (1970); 1970 U.S. Code Cong. & Admin.News pp. 5519, 5522. It did so because it feared that "business firms clustering about banks in holding company systems" would have "a very real competitive advantage" in obtaining credit, that holding company banks "might deny credit to competing firms" not part of the holding company system, and that such banks "might . . . grant credit to other borrowers only on condition that they agree to do business with the affiliated firm." In short, Congress feared that if we ease ". . . the line between banking and commerce . . . we run the risk of cartelizing our economy." S.Rep.No.91–1084, *supra*, at 3; 1970 U.S.Code Cong. & Admin.News at 5521–5522, quoting former Federal Reserve Board Chairman Martin. It therefore prohibited bank holding companies from engaging in nonbanking activities without Board approval "in order to guard against the possible future perpetration of abuses." S.Rep.No.91–1084, *supra*, at 3; 1970 U.S.Code Cong. & Admin.News at 5522. Indeed, "Congress believed that concentration of economic resources in a single entity beyond a certain point was harmful regardless of the proven existence of any anti-competitive effects." *Alabama Association of Insurance Agents v. Board of Governors of the Federal Reserve System*, 5 Cir., 1976, 533 F.2d 224, 251, amended and rehearing denied, 1977, 558 F.2d 729. *Accord, Citicorp v. Board of Governors of the Federal Reserve System*, 2 Cir., 1979, 589 F.2d 1182, 1191.

At the same time, Congress realized that in some instances the public might well benefit if bank holding companies were permitted to offer their clients a full range of financial services, including services which went beyond purely banking services. It thus added Section 4(c)(8), 12 U.S.C. § 1843(c)(8) which authorizes the Board to permit bank holding companies such as BankAmerica to engage in nonbanking activities which are "so closely related to banking or managing or controlling banks

as to be a proper incident thereto." To guard against potential abuses, Congress specifically required the Board to consider the dangers on a case by case basis:

> In determining whether a particular activity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices.

12 U.S.C. § 1843(c)(8).

■ Just as Congress struck a careful balance in fashioning the substantive standard for approval, we must interpret the ninety-one day rule in a manner which fully respects both of Congress' objectives. On the other hand, the ninety-one day rule must promote prompt consideration of applications in order that bank holding companies submitting meritorious applications can get on with helping "to meet adequately the financial service needs of the country." *See Citicorp v. Board of Governors of the Federal Reserve System*, 2 Cir., 1979, 589 F.2d 1182, 1186, 1187; *Central Wisconsin Bankshares v. Board of Governors of the Federal Reserve System*, 7 Cir., 1978, 583 F.2d 294, 296; *North Lawndale Economic Development Corporation v. Board of Governors of the Federal Reserve System*, 7 Cir., 1977, 553 F.2d 23, 27; *Tri-State Bancorporation, Inc. v. Board of Governors of the Federal Reserve System*, 7 Cir., 1975, 524 F.2d 562, 564–65, 567. *See also* H.R. Rep.No.91–387, 91st Cong., 1st Sess. 13 (1970). (Federal Reserve System characterized as "unduly slow in rendering decisions on applications made.")

On the other hand, we must interpret the ninety-one day rule in a way which gives the Board an adequate opportunity to discover and evaluate "possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests," and the like, so that the Board can "insure that the activities of

these companies do not result in harm to the public. . . ." During hearings on the 1970 Amendments which added the ninety-one day provision, even a chief proponent of the rule explained that the statutory period would start only when the Federal Reserve System "was ready to investigate at the Board level and felt that all they (sic) had to do was deliberate and not hunt for additional facts. . . ." Hearings on Bills to Amend the Bank Holding Company Act of 1956, Before the Committee on Banking and Currency, United States Senate, 91st Cong., 2d Sess. 961 (1970) (J. Harvie Wilkinson, Jr., testifying on behalf of the Association of Registered Bank Holding Companies); *Accord, Citicorp v. Board of Governors of the Federal Reserve System, supra,* 589 F.2d at 1187.

Section 4(c)(8), 12 U.S.C. § 1843(c)(8), itself requires the Board to approve an application only "after due notice and opportunity for hearing." Congress recognized that an applicant's potential competitors will often have an economic incentive to invest the time and money to develop and present the public interest arguments against allowing an applicant to enter, or to expand its share of, a market. *See, e. g., Federal Communications Commission v. Sanders Brothers Radio Station,* 1940, 309 U.S. 470, 477, 60 S.Ct. 693, 84 L.Ed. 869. Anxious "for adversary proceedings to take place in order that all issues may be aired completely," H.R. (Conf.) Rep. No. 91–1747, 91st Cong., 2d Sess. 30 (1970); 1970 U.S.Code Cong. & Admin.News, 5561, 5580–5581, Congress hoped to turn competitor self-interest into advocacy of the public interest by enacting 12 U.S.C. § 1850.

That provision grants potential competitors full standing to bring out "possible adverse effects" when it provides that:

With respect to any proceeding before the Federal Reserve Board wherein an applicant seeks authority . . . to engage directly or indirectly in a non-banking activity pursuant to section 1843 . . . a party who would become a competitor of the applicant or subsidiary

thereof by virtue of the applicant's or its subsidiary's acquisition, entry into the business involved, or activity shall have the right to be a party in interest in the proceeding and, in the event of an adverse order of the Board, shall have the right as an aggrieved party to obtain judicial review thereof as provided in section 1848 of this title or as otherwise provided by law.

While the Board's regulations provide that it will conduct a hearing where "appropriate," *cf.* 12 C.F.R. 225.4(b)(2), the District of Columbia Circuit has held that the Board must hold a hearing whenever "adjudicative fact[s] are [placed] in dispute." *Independent Bankers Association of Georgia v. Board of Governors,* 1975, 170 U.S.App.D.C. 278, 516 F.2d 1206.

In this case, the Board ordered a hearing on BankAmerica's application on May 20, 1977. In light of the importance Congress placed upon the Board's considering objections and evidence from an applicant's potential competitors, BankAmerica concedes that if the Board had ordered the hearing before the ninety-one days had run, the record would at that point have become incomplete pending the completion of the hearing. Because the hearing was stayed by stipulation pending this appeal, the parties agree that if the Board ordered the hearing in time, the record would today still remain incomplete, and thus the ninety-one days would not yet have run. For this reason, BankAmerica can only prevail if its application had been approved by operation of law before May 20, 1977.

We follow the Seventh Circuit in adopting a "retriggering" approach to the ninety-one day rule. *Central Wisconsin Bankshares, Inc. v. Board of Governors of the Federal Reserve System,* 7 Cir., 1978, 583 F.2d 294, 296. *See also First Lincolnwood Corp. v. Board of Governors of the Federal Reserve System,* 7 Cir., 1976, 546 F.2d 718, *modified in banc on other grounds,* 1977, 560 F.2d 258; *rev'd on other grounds,* 1978, —— U.S. ——, 99 S.Ct. 505, 58 L.Ed.2d 484; [2] *Tri-State Bancorporation, Inc. v.*

---

2. *Central Wisconsin Bankshares* involved an application by a bank to acquire the voting

shares of another bank. *First Lincolnwood* and *North Lawndale Economic Development Cor-*

*Board of Governors of the Federal Reserve System,* 7 Cir., 1975, 524 F.2d 562.

█ Under a retriggering approach the record can be "complete" on a number of successive occasions. It first becomes complete when the staff of the Board receives the application itself and any information the Board has in good faith requested from the applicant and/or other interested parties. The completeness of the record triggers the running of the ninety-one days.

If within the first ninety-one day period the Board receives additional information from an outside source such as another governmental agency or a potential competitor and that additional information is neither irrelevant nor simply cumulative, the Board can properly make the new information part of the record on the application. The record thus becomes complete for a second time, triggering the running of a second ninety-one day period. If the Board then responds to the new material by ordering a hearing or in good faith requesting further relevant noncumulative information, the record would remain incomplete until the hearing took place or until the Board received the requested information. Upon completion of the hearing or upon receipt of the new materials, a third ninety-one day period would commence. We allow the Board to await requested information, because "[w]e do not think Congress intended to force the Board either to waste time in possibly premature deliberations or to sacrifice part of its 91 days for decision-making." *Citicorp, supra,* 589 F.2d at 1187.

This case provides an example. The record had become complete, triggering a ninety-one day period when the Board received National's reply to BankAmerica's December 6, 1976 submission to the Board. However, on December 23, 1976, BankAmerica submitted a written response to National's comments. BankAmerica believes that its response was neither irrelevant nor simply cumulative; so it concedes that when the

Board made that response part of the record, it triggered the running of a new ninety-one day period. This interpretation of the rule limits the Board's deliberations to ninety-one days, but does not deprive the Board of relevant information it may need to assess potential adverse impacts intelligently.

We recognize that the Board will often wait to receive staff recommendations or summaries of the record before passing upon an application. In the past, the Board has argued that, like relevant, noncumulative materials from outside sources, these staff memoranda should become a part of the "complete record" and thus trigger new ninety-one day periods. Bank holding companies have complained that such an approach would enable the Board staff to control the running of the ninety-one day period. *See Central Wisconsin Bankshares, supra,* 583 F.2d 296; *Citicorp, supra,* 589 F.2d at 1189, n.15; *North Lawndale, supra,* 553 F.2d at 27; *Tri-State Bancorporation, supra,* 524 F.2d at 566.

█ In the interests of expediting Federal Reserve System deliberations, we interpret the phrase "submission to the Board of the complete record" to mean final submission of outside materials to the Board by delivery of them to whatever officer or employee of the Board is authorized to receive them. Submission of final staff memoranda to the Board will not start a new ninety-one day period, and time spent waiting for the staff to prepare such memoranda will have to come out of the ninety-one days given the Board to pass upon the final record. *Tri-State Bancorporation, supra,* 524 F.2d at 566, *Citicorp, supra,* 589 F.2d at 1189.

█ This approach removes any appreciable danger that the Board can manipulate the record to get around the rule. While the Board may still solicit information from

---

*poration, supra,* both involved applications by bank holding companies to acquire banks. As such, these applications were processed under Section 3(b) of the Act, 12 U.S.C. § 1842(b) rather than under Section 4(c) of the Act, 12

U.S.C. § 1843(c). The cases are nevertheless fully in point because Section 3(b) contains a ninety-one day provision identical to the one found in Section 4(b) of the Act. *See Memphis Trust, supra,* 584 F.2d at 923 n.5.

outside sources, the Board's receipt of such outside information will not start another ninety-one day period if the Board has solicited the information in bad faith, or if the information received is either irrelevant or merely cumulative. *See Central Wisconsin Bankshares, supra,* 583 F.2d at 296, 296 n.3, 297; *North Lawndale, supra,* 553 F.2d at 27; *First Lincolnwood, supra,* 546 F.2d at 721; *Tri-State Bancorporation, supra,* 524 F.2d at 566–67.

Applying the rule to the facts of this case, we first note that under BankAmerica's own interpretation, the ninety-one days could not run until March 28, 1977. On March 4, 1977, the Board received a protest from Delmarva Bank Data Processing Center, Inc., of Denton, Maryland. If that protest properly became part of the complete record, it triggered another ninety-one day period which would have expired June 3, 1977. Because the Board's May 20, 1977 hearing order would have prevented such a ninety-one day period from expiring by keeping the record open to receive information brought out at the hearing, if the Delmarva protest properly became part of the record, BankAmerica's application was never approved by operation of law.[3]

■ BankAmerica objects to making the March 2, 1977 Delmarva protest part of the "complete" record on the grounds that it is irrelevant, merely cumulative, and untimely. We disagree. The protest contains information clearly relevant to the public benefit criteria the Board must apply under 12 U.S.C. § 1843(c)(8). Delmarva explains, for example, why it believes that existing bank data processors already "quite adequately serve[ ]" the state and national banks of Maryland and Delaware, and how a small independent such as Delmarva does "not have the resources to match the giant" BankAmerica.

Delmarva does repeat arguments already part of the record when it warns against monopolization and "concentrations of power . . . not in the best interests of banking." Nevertheless, taken as a whole, the protest can hardly be characterized as merely cumulative, for it was the first communication the Board received specifically addressing the data processing needs of eastern Maryland and Delaware, a significant geographic market that Decimus proposed to begin serving.

■ Finally, BankAmerica argues that the Delmarva protest was untimely because the Board received it more than thirty days after BankAmerica published its two and one-half inch legal notice in Baltimore News America on September 8, 1976. BankAmerica claims that the Board has bound itself not to make part of the "complete record on [an] application" anything received from interested parties who fail to contact the Board within thirty days of such a publication notice. BankAmerica points to the Board's "Form for Publication of Notice," which includes the statement that "Persons wishing to comment on this proposal should submit their views in writing within 30 days . . . ." and to a portion of the Board's regulations concerning the processing of § 1843(c)(8) applications by individual reserve banks which states, "If adverse comments of a substantive nature are received by the Reserve Bank within 30 days after the company has so published its proposal or if it otherwise appears appropriate in a particular case, the Reserve Bank may inform the company that (i) the proposal shall not be consummated until specifically authorized by the Reserve Bank or by the Board. . . ." 12 C.F.R. § 225.4(b)(1).

The Board counters by emphasizing that the notice form reads "should" rather than

---

**3.** Other events could also have retriggered the ninety-one day period, but we need not consider them, because the Delmarva protest properly became a part of the record, thus retriggering the ninety-one day period.

We also need not pass upon the Board's contention that it had the right to leave the record open pending the Third Circuit's May 5, 1977

decision in *National Computer Analysts v. Decimus Corp.,* 3 Cir., 1977, 556 F.2d 568. A reversal in that case could have paved the way for a district court decision closing down Decimus' Piscataway operation. The Board argues that such a shutdown would have made consideration of the expansion application totally unnecessary.

"must," and that the regulation gives a Reserve Bank the power to order a bank holding company not to consummate a proposal, not only in light of comments received within thirty days, but also, "if it otherwise appears appropriate in a particular case." The Board interprets the form of notice and regulation as at most giving the Board discretion to reject comments received after thirty days. In light of Congress' insistence that the Board take into account potential adverse impacts, even BankAmerica concedes that it would have been proper for the Board to consider the substance of Delmarva's comments so long as it did not actually make the comments a part of the "complete record."

We accept the Board interpretation of its own form and regulations. We are particularly inclined to follow the Board's interpretation in light of our concern that BankAmerica's approach, while it would reduce needless delays in Board deliberations in some cases, would also require the Board in many instances to act before it had the information necessary to enable it to weigh potential adverse impacts intelligently.

Accepting BankAmerica's thirty-day cutoff would also cast grave doubts upon the adequacy of BankAmerica's newspaper notice and the publication notice regulation it purported to satisfy. Congress specifically afforded potential competitors a right to "due notice and opportunity for hearing" in adding 12 U.S.C. § 1843(c)(8) to the Bank Holding Company Act. In this case, seven competitors and three Congressmen and Senators ultimately sought to provide the Board with apparently relevant information. Yet, it appears that none of these outside parties learned of the Decimus application within the thirty days. We quite understand how all of these people could have managed to miss a two and one-half

inch fine print announcement buried, for example, among probate notices, solicitations for bids to supply screwdrivers to a housing authority, and classified ads for summer homes. See Exhibit D–17.[4]

The Delmarva protest, coupled with the Board hearing order, kept the ninety-one day rule from coming into play. BankAmerica's application was not approved by operation of law.

In No. 77–3629, the judgment of the district court is reversed. The action is to be dismissed. In No. 77–2173, BankAmerica's petition for review is dismissed. In No. 77–3485, National's appeal is dismissed.

SNEED, Circuit Judge (concurring and dissenting):

I concur in Parts I and II of the majority's opinion but respectfully dissent from Part III.

In Part III the majority implies that receipt by the Board of unsolicited but relevant and noncumulative information permits the Board to reopen the record and trigger the running of a new 91-day period without providing any explicit notice to the applicant. The majority apparently would permit the receipt of any relevant noncumulative information to trigger the beginning of a new 91-day period so long as the Board designated the material as part of the record and physically placed it in the file. I do not believe that such a practice is consistent with the congressional intent to alleviate the dilatoriness of the Board and to inject some certainty into the review process. Consistency with such intent would be better achieved by making the dispatch by the Board of notice to the applicant of its intention to trigger a new 91-day period a condition precedent to the commencement of such new period.

---

4. National, for example, was attempting to keep close tab on the activities of Decimus because it had a lawsuit in progress against the company, and had been trying to convince the Board that Decimus had been improperly soliciting business in Philadelphia and Southern New Jersey. However, the "timeliness" of National's October 7, 1976 protest was apparently a fluke. At footnote 7 of its brief, BankAmerica argues that National's October 7 letter was only a protest against Decimus' alleged flouting of a Board instruction to cease Pennsylvania solicitations and not a protest specifically directed against the application designed to legitimize those solicitations. National did not learn of the application until October 13, 1976. It sent the Board a telegram the next day, but under BankAmerica's thirty day rule, that telegram would have been four days too late.

This case amply illustrates the uncertainty created by the Board's policy of using various informal methods to notify an applicant that relevant noncumulative information has been received and is being included in the administrative record. For example, during the period between December 27, 1976, the date BankAmerica claims the record first became complete, and May 20, 1977, the date the Board entered its order for a formal hearing, the Board sent three different types of written communications to the applicant, BankAmerica. Several letters were sent to BankAmerica explicitly stating that the Board had received additional information which it was considering to be part of the record. The Board sent BankAmerica one letter along with a copy of a Board letter to an individual who had submitted information in which letter the Board indicated to the individual that it would make his letter a part of the record. Finally, the Board merely forwarded to BankAmerica copies of Board letters responding to persons who had submitted information, in which the Board indicated that the information was to be included in the record. At least four exchanges of these types occurred during the period between December 27, 1976 and May 20, 1977. Because the Board apparently made no attempt to keep track of the current status of the 91-day period, and because the Board used such varied ways of notifying the applicant that new information had been received and was being included in the record, it is difficult for an applicant to know with certainty whether, and when, retriggering has occurred. Sound administrative practice would require that the Board dispatch explicit notice to the applicant each time the Board deems the record reopened and a new 91-day period commenced.

Because the record indicates that the Board's May 20, 1977 order occurred after the termination of both the initial 91-day period, as well as after the end of any new period triggered by the applicant's receipt of any explicit notice by the Board that a new period had begun, I respectfully dissent from Part III of the majority opinion.